JUDGE CARTER

**MEISTER SEELIG & FEIN LLP**
Two Grand Central Tower, 19th Floor
140 East 45th Street
New York, NY 10017
Jeffrey Schreiber
Kevin Fritz
Attorneys for Plaintiff

13 CIV 1095



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
L. LONDELL MCMILLAN,

                Plaintiff,

    -against-

                **COMPLAINT**

BARCLAYS BANK PLC,

                Defendant.
------------------------------------------------------------X

        Plaintiff L. Londell McMillan ("Plaintiff"), by his attorneys Meister Seelig & Fein LLP, as and for his complaint against Barclays Bank PLC ("Barclays" or "Defendant"), hereby alleges as follows:

### NATURE OF THE ACTION

        1.    Plaintiff brings this action to challenge a fraudulent scheme orchestrated and arranged by the now-bankrupt law firm of Dewey & LeBoeuf LLP ("Dewey & LeBoeuf") and one of its then-financial affiliates, Barclays. Barclays alleges that, pursuant to a purported letter agreement, Barclays loaned money to Plaintiff to fund his prior capital account at Dewey & LeBoeuf (which had already been paid). Because the purported agreement was solely arranged by Barclays and Dewey & LeBoeuf for their own account, and unsupported by consideration to Plaintiff, this action seeks the rescission of that agreement and justice as a matter of law.

1

## PARTIES, JURISDICTION AND VENUE

2. Plaintiff is a natural person who resides in New York, NY and who is licensed to practice law in the State of New York and the State of Connecticut.

3. Barclays is a public limited company incorporated in England and Wales, and is engaged in the business of banking. Barclays, either directly or through its subsidiaries, conducts substantial business in the State of New York.

4. The Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the matter is between a citizen of a State and a citizen of a foreign state and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district and, alternatively, because Barclays is subject to personal jurisdiction in this judicial district.

## ALLEGATIONS APPLICABLE TO ALL CLAIMS FOR RELIEF

6. Upon graduating from law school in 1990, Plaintiff worked as an attorney in the corporate and media department of the law firm of LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf Lamb"). In 1993, Plaintiff joined the law firm of Gold, Farrell & Marks (now part of Sonnenschein Nath & Rosenthal LLP) where he developed a well-known entertainment law practice in both litigation and transactional contact business. In 1996, Plaintiff founded his private boutique law practice, The McMillan Firm, which specialized in entertainment and media law.

7. In 2007, LeBoeuf Lamb approached Plaintiff and asked him to re-join that law firm as the head of its new media, entertainment and sports division. Plaintiff entered

negotiations with LeBoeuf Lamb regarding his law practice and his need to have members of his firm join him should he decide to fold his practice into LeBoeuf Lamb.

8. In May 2007, Plaintiff signed LeBoeuf Lamb's offer letter and agreed to re-join the law firm as a partner and head of its new media, entertainment and sports division. Plaintiff accepted a position at LeBoeuf Lamb and agreed, in a written offer letter, to $1,500,000 in compensation for each of the next three (3) years, payable in monthly draws of $25,000 (less deductions for taxes and benefits) along with periodic distributions for the remaining amounts owed. Plaintiff brought several members of The McMillan Firm to LeBoeuf Lamb, including another corporate partner to join the firm.

9. Immediately, Plaintiff established a profitable and high-profile entertainment law firm practice for LeBoeuf Lamb (and later Dewey & LeBoeuf), representing some of the most world renowned entertainment, media and sports clients.

10. In or about May 2007, LeBoeuf Lamb's Chief Financial Officer, Joel Sanders, advised Plaintiff that: (a) upon becoming a partner at the firm, Plaintiff was required to make a capital contribution to the operating capital of LeBoeuf Lamb in the amount of $540,000.00, which was 36% of his annual compensation; (b) to fund his capital contribution, Plaintiff could utilize a capital loan program arranged by LeBoeuf Lamb with one if its lenders; and (c) there was no risk to Plaintiff to utilize the capital loan program because, upon his withdrawal from LeBoeuf Lamb, the law firm would repay any amounts due under the capital loan program. Plaintiff declined to utilize the capital loan program.

11. In or about October 2007, LeBoeuf Lamb merged with another large and prominent law firm, Dewey Ballantine LLP to create Dewey & LeBoeuf. As a result of the

merger, Dewey & LeBoeuf became one of the largest law firms in the world. This mega-merger caused immediate headline news and certain conflict within the new firm.

12. In a Memorandum dated March 6, 2008, Joel Sanders and the rest of Dewey & LeBoeuf's Executive Committee advised Plaintiff, and other partners, of another capital loan program, arranged by Dewey & LeBoeuf, being offered by Barclays (the "Barclays Program") as an alternative method for Plaintiff to fund capital contributions (the "Memo").

13. The Memo began: "In order to fund the Firm's working capital needs the Executive Committee has approved a capital loan program sponsored by Barclay's Bank."

14. The Memo included the following note on the bottom of the page: "Based upon 2007 Participation Target of $1,500.000.00, your 2007 capital obligation is $540,000.00, of which $0 has already been paid, leaving you with an unpaid capital balance of $540,000.00."

15. The Memo further stated and explained: "There will be no financial impact to you with respect to this loan, until such time as your capital is actually due to the firm."

16. The Memo requested that Plaintiff sign an attached application form and return it to Mr. Sanders "no later than March 12, 2008 to facilitate this process[.]" Plaintiff declined to enroll in the Barclays Program.

17. In 2008, Dewey & LeBoeuf paid Plaintiff $25,000 every month (less deductions for taxes and benefits) and distributed to Plaintiff an additional $390,000, but failed to pay him the remaining $810,000 of his annual compensation due and owing to him. Dewey & LeBoeuf also failed to pay other high-earning partners their agreed upon annual compensation. There was no basis to deprive Plaintiff of his compensation since he was one of the partners who generated substantial revenue for Dewey & LeBoeuf.

18. In 2009, Dewey & LeBoeuf only paid Plaintiff a total of $540,416.67, but failed to pay him the remaining $959,583.33 of his agreed-upon annual compensation. Again, Dewey & LeBoeuf also failed to pay other high-earning partners their agreed upon annual compensation.

19. Notwithstanding the substantial sums owed to Plaintiff, which were never received by him, Dewey & LeBoeuf reported higher earnings to state and federal authorities than the compensation and income that Plaintiff received. The over-reportings were brought to the attention of Dewey & LeBoeuf's management.

20. On March 4, 2010, Plaintiff met with Steve DiCarmine, Dewey & LeBoeuf's Chief Operating Officer, and Jeffrey Kessler, Dewey & LeBoeuf's Global Litigation Chair and a member of the law firm's Executive Committee, and advised them of his plans to wind-down and withdraw from the firm.

21. Dewey & LeBoeuf accepted Plaintiff's withdrawal from the law firm, yet allowed Plaintiff to operate on the premises to wind down business and legal matters.

22. In an email sent to Plaintiff on June 22, 2010, Joel Sanders outlined the amount of compensation that Dewey & LeBoeuf deemed was owed to Plaintiff. At the bottom of the email, Mr. Sanders included the following chart (emphasis added):

| Year | Amount Owed |
|---|---|
| 2008 | 498,750.00 |
| 2009 | 70,791.66 |
| 2010 | 254,166.65 |
| Compensation Owed Partner: | 823,708.31 |
| **Capital Owed Firm** | (540,000.00) |
| Net Amount due Partner | 283,708.31 |

In the email, Mr. Sanders advised Plaintiff that the amount owed by Dewey & LeBoeuf to Plaintiff had been reduced by $540,000, the amount that Plaintiff had theretofore never

contributed, as the law firm required. Specifically, Mr. Sanders expressly wrote to Plaintiff: "Your capital has already been deducted and processed as it was way overdue and you never processed the loan documents." Plaintiff was advised that he would receive all such sums including his capital contribution made to the firm, which was deducted from his compensation.

23. As of June 30, 2010, the law firm owed Plaintiff over $1,700,000 in compensation, none of which has been paid.

24. According to Barclays' allegations (made after Dewey & LeBoeuf filed for bankruptcy on May 28, 2012), Plaintiff and Barclays entered into a letter agreement dated June 24, 2010 (the "Letter Agreement") pursuant to which Barclays agreed to provide a loan of $540,000 (the "Loan") "to be used to assist [Plaintiff] with a partnership capital subscription to Dewey & LeBoeuf LLP (the 'Firm')."

25. Section 3 of the purported Letter Agreement provides that the Loan "will be available for drawing in a single amount" and that "any amount drawn will be credited to an account" in the name of Dewey & LeBoeuf.

26. Plaintiff has no recollection of signing any such Letter Agreement and, given that Dewey & LeBoeuf had previously advised Plaintiff in the aforementioned June 22, 2010 email that his capital contribution was being deducted from compensation owed to him, there was no reason for Plaintiff to sign the Letter Agreement and obtain the Loan to fund his capital contribution (which was no longer owed).

27. Plaintiff never received any funds from Barclays.

28. Barclays has not presented Plaintiff with any promissory note executed by Plaintiff in connection with the Loan or any communications between Barclays and Plaintiff, despite requests to receive such information from Barclays.

0740-002 Doc# 13 v.0

29. The Letter Agreement is a fabrication. Plaintiff had no dealings with Barclays regarding a loan and Plaintiff did not need a loan.

30. Upon information and belief, Barclays had ceased making loans available to partners of Dewey & LeBoeuf either before or shortly after Plaintiff withdrew from the firm.

31. On May 28, 2012, Dewey & LeBoeuf filed a petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (*In re Dewey & LeBoeuf LLP*, Case No. 12-12321 (MG)) (the "Dewey Bankruptcy").

32. Barclays never communicated with Plaintiff in any manner whatsoever about the Loan until after Dewey & LeBoeuf filed for bankruptcy, which was well after Plaintiff withdrew from the law firm.

33. According to a "Claim Form" and "Particulars of Claim" mailed by Barclay's counsel to Plaintiff, on or about December 7, 2012, Barclays filed a claim in the United Kingdom's High Court of Justice against Plaintiff alleging that the Loan was in default and seeking in excess of $550,000 in damages (the "UK Proceeding").

34. Plaintiff has not been properly served with the Claim Form or the Particulars of Claim in the UK Proceeding and has filed an Acknowledgement of Service in the UK Proceeding disputing jurisdiction, and such objection to jurisdiction does not amount to a submission to the jurisdiction.

**FIRST CLAIM FOR RELIEF**
**(Declaration that the Letter Agreement is Invalid and Unenforceable)**

35. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 34 as if fully set forth herein.

36. Plaintiff never had any dealings with Barclays and did not enter into the Letter Agreement with Barclays.

37. There was no meeting of the minds between Plaintiff and Barclays with respect to the terms of the Letter Agreement.

38. Plaintiff is entitled to a judgment declaring that the Letter Agreement is invalid and unenforceable.

## SECOND CLAIM FOR RELIEF
### (Rescission of Letter Agreement for Lack of Consideration)

39. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 38 as if fully set forth herein.

40. Section 1 of the Letter Agreement states that its "Purpose" is for the Loan to be used to fund Plaintiff's capital contribution to Dewey & LeBoeuf."

41. Plaintiff had no need to further fund his capital account.

42. Prior to the date of the Letter Agreement, Dewey & LeBoeuf acknowledged to Plaintiff that his $540,000 capital contribution had been paid (by a deduction from the amounts owed by the law firm to Plaintiff).

43. Furthermore, even assuming that Dewey & LeBoeuf had not so acknowledged, no capital contribution was due from Plaintiff to the law firm because the amount of compensation that the law firm owed Plaintiff greatly exceeded $540,000 and his capital account was fully funded prior to the date of the purported Letter Agreement.

44. Thus, no capital contribution from Plaintiff to the law firm was actually due.

45. The Loan proceeds were never delivered to Plaintiff.

46. Plaintiff did not receive any consideration in exchange for allegedly being liable for repayment of the Loan.

47. Barclays claims that the Letter Agreement is a binding and valid agreement.

48. Plaintiff has no adequate remedy at law other than this form of action to have his rights determined as to the matters set forth herein.

49. Plaintiff is entitled to a judgment rescinding the Letter Agreement for lack of consideration.

### THIRD CLAIM FOR RELIEF
(Rescission of Letter Agreement for Mutual Mistake)

50. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 49 as if fully set forth herein.

51. At the time that the Letter Agreement was allegedly entered into, both Plaintiff and Barclays were mistaken about the same material fact – that a capital contribution of $540,000 was due from Plaintiff to Dewey & LeBoeuf.

52. In actuality, at the time that the Letter Agreement was allegedly entered into, no capital contribution was due from Plaintiff to Dewey & LeBoeuf.

53. Plaintiff never received any funds directly from Barclays.

54. Plaintiff has no adequate remedy at law other than this form of action to have his rights determined as to the matters set forth herein.

55. Plaintiff is entitled to a judgment rescinding the Letter Agreement based upon mutual mistake.

### FOURTH CLAIM FOR RELIEF
(Rescission of Letter Agreement for Fraud)

56. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 55 as if fully set forth herein.

57.     According to section 10.1(j) of the Letter Agreement, an "Event of Default" includes "the event of any indebtedness of the Firm in excess of US$250,000 becoming immediately due and payable, or capable of being declared so due and payable, prior to its stated maturity, by reason of default on the part of any person...."

58.     According to the Letter Agreement, upon an Event of Default, Barclays may demand repayment of the outstanding Loan and all accrued interest.

59.     At the time that the parties allegedly entered into the Letter Agreement, Barclays knew that Dewey & LeBoeuf had already incurred indebtedness in excess of $250,000 that was immediately due and payable (the "DL Indebtedness"). Stated differently, Barclays knew that an Event of Default existed the moment that the Letter Agreement was executed.

60.     Barclays knew of the DL Indebtedness because Barclays had a longstanding relationship with Dewey & LeBoeuf through, at a minimum, the Barclays Program for funding capital contributions.

61.     Barclays also knew of the DL Indebtedness because it ceased making loans to partners of Dewey & LeBoeuf based upon financial reasons, and Barclays failed to notify Plaintiff of the same.

62.     Barclays failed to advise Plaintiff of the DL Indebtedness, despite its duty to advise Plaintiff of that material information.

63.     Barclays had a duty to disclose the DL Indebtedness to Plaintiff because Barclays made a partial disclosure, or "half-truth," in the Letter Agreement – namely that any indebtedness by Dewey & LeBoeuf in excess of $250,000 *would be* an Event of Default. The full truth, undisclosed to Plaintiff, was that Dewey & LeBoeuf *was already* indebted more than

$250,000 and that such indebtedness was capable of being declared immediately due and payable.

64. Barclays also had a duty to disclose the DL Indebtedness to Plaintiff because Barclays possessed superior knowledge of Dewey & LeBoeuf's financial condition, not readily available to Plaintiff (such information was only available to the law firm's senior management or Executive Committee members) and because, assuming that Plaintiff did enter into the Letter Agreement, Barclays knew that Plaintiff was acting on the basis of mistaken knowledge that an Event of Default was not already existing the moment the Letter Agreement was executed.

65. Barclays intentionally failed to disclose the DL Indebtedness to Plaintiff to induce Plaintiff to enter into the Letter Agreement (assuming it is not a fabrication).

66. By fraudulently inducing Plaintiff to enter into the Letter Agreement, upon the immediately present Event of Default, Barclays could pursue Plaintiff for hundreds of thousands of dollars while having no obligation to fund Plaintiff's capital contribution (which Plaintiff had already paid via a deduction of amounts of compensation owed to him).

67. Even assuming that Plaintiff signed the Letter Agreement, Plaintiff believed that Barclays' representations were full and complete and that Barclays did not omit any material information.

68. Even assuming that Plaintiff signed the Letter Agreement, Plaintiff signed the Letter Agreement in reasonable reliance upon Barclays' representations that an Event of Default did not already exist.

69. Even assuming that Plaintiff signed the Letter Agreement, Plaintiff would not have signed the Letter Agreement if he had known the truth – that an Event of Default already existed by virtue of the DL Indebtedness.

70. Given Barclays' fraudulent conduct, Plaintiff is entitled to a judgment declaring that the Letter Agreement is rescinded.

## FIFTH CLAIM FOR RELIEF
### (Declaration that the Loan is Not Due and Payable Until December 31, 2020)

71. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 70 as if fully set forth herein.

72. Barclays claims that the Loan is due and payable by Plaintiff.

73. Section 5(c) of the Letter Agreement states that, in the event of: (a) Plaintiff "ceasing to practice as a partner with the Firm" and (b) "the provisions of Article X of the Firm's Partnership Agreement preventing immediate repayment of [Plaintiff's] partnership capital, the Loan shall become due and payable at the times and in such amounts as [Plaintiff's] capital account is repaid in accordance with the Firm's Partnership Agreement … and in any event no later than the date falling 120 months after the date upon which [Plaintiff] ceases to practice as a partner with the Firm."

74. Dewey & LeBoeuf has not repaid Plaintiff's capital account in accordance with the Firm's Partnership Agreement.

75. Thus, even assuming that the Letter Agreement is deemed valid, the Loan is due and payable on December 31, 2020, said date being 120 months after December 31, 2010, the date upon which Plaintiff ceased to practice as a partner of the law firm.

76. Plaintiff has no adequate remedy at law other than this form of action to have his rights determined as to the matters set forth herein.

77. In the alternative to rescinding the Letter Agreement, the Court should enter judgment declaring that the Loan is not due and payable until December 31, 2020.

Wherefore, Plaintiff respectfully requests that the Court enter judgment:

(a) on the First Claim for Relief, declaring that the Letter Agreement is invalid and unenforceable;

(b) on the Second Claim for Relief, rescinding the Letter Agreement for lack of consideration;

(c) on the Third Claim for Relief, rescinding the Letter Agreement based upon mutual mistake;

(d) on the Fourth Claim for Relief, declaring that the Letter Agreement is rescinded based upon fraud;

(e) on the Fifth Claim for Relief, declaring that the Loan is not due and payable until December 31, 2020;

(f) awarding Plaintiff the costs and disbursements of the action, including attorneys' fees; and

(g) granting Plaintiff such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:   New York, New York   MEISTER SEELIG & FEIN LLP
         February 15, 2013

         /s/ Kevin Fritz
         Jeffrey Schreiber (js@msf-law.com)
         Kevin Fritz (kaf@msf-law.com)
         Two Grand Central Tower, 19th Floor
         140 East 45th Street
         New York, NY
         Telephone: (212) 655-3500
         Facsimile: (212) 655-3535
         Attorneys for Plaintiff

0740-002 Doc# 13 v.0