**MEISTER SEELIG & FEIN LLP**
Two Grand Central Tower, 19th Floor
140 East 45th Street
New York, NY 10017
Jeffrey Schreiber
Kevin Fritz
Attorneys for Plaintiff



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

L. LONDELL MCMILLAN,

                    Plaintiff,

       -against-

BARCLAYS BANK PLC, STEVEN H. DAVIS,
STEPHEN DICARMINE, JOEL I.
SANDERS, FRANCIS J. CANELLAS, and
DOES 1 through 50, inclusive,

                    Defendants.
------------------------------------------------------------X

13 CIV 1095 (ALC)(DF)

**AMENDED COMPLAINT**

       Plaintiff L. Londell McMillan ("Plaintiff"), by his attorneys Meister Seelig & Fein LLP,

as and for his complaint against Barclays Bank PLC ("Barclays"), Steven H. Davis, Stephen

DiCarmine, Joel I. Sanders, and Francis J. Canellas (collectively the "Individual Defendants" and

together with Barclays, "Defendants"), hereby alleges as follows:

### NATURE OF THE ACTION

      1.     Plaintiff brings this action to challenge a fraudulent scheme orchestrated and

arranged by officers and directors of the now-bankrupt law firm of Dewey & LeBoeuf LLP

("Dewey & LeBoeuf") and one of its then-financial affiliates, Barclays. Barclays alleges that,

pursuant to a purported letter agreement, Barclays loaned money to Plaintiff to fund his prior

capital account at Dewey & LeBoeuf (which had already been paid). Because the purported

agreement was solely arranged by Barclays and Dewey & LeBoeuf for their own account, and

1

unsupported by consideration to Plaintiff, this action seeks the rescission of that agreement and monetary damages.

## PARTIES, JURISDICTION AND VENUE

2.     Plaintiff is a natural person who resides in New York, NY and who is licensed to practice law in the State of New York and the State of Connecticut.

3.     Barclays is a public limited company incorporated in England and Wales, and is engaged in the business of banking.  Barclays, either directly or through its subsidiaries, conducts substantial business in the State of New York.

4.     Steven H. Davis is a natural person who, upon information and belief, resides in the State of New York.  At all relevant times, Mr. Davis was the Chairman of Dewey & LeBoeuf.

5.     Stephen DiCarmine is a natural person who, upon information and belief, resides in the State of New York.  At all relevant times, Mr. DiCarmine was the Executive Director of Dewey & LeBoeuf.

6.     Joel I. Sanders is a natural person who, upon information and belief, resides in the State of Florida.  At all relevant times, Mr. Sanders was the Chief Financial Officer of Dewey & LeBoeuf, worked in the law firm's office in Manhattan, and engaged in the conduct alleged herein while present in New York.

7.     Francis J. Canellas is a natural person who, upon information and belief, resides in the State of New York.  At all relevant times, Mr. Canellas was the Finance Director of Dewey & LeBoeuf.

0740-002 Doc# 30 v.0

8.     Upon information and belief, the Individual Defendants have claimed in other proceedings that they have contractual and statutory rights to be indemnified by Dewey & LeBoeuf for any amounts they are required to pay as a result of legal actions such as this one.

9.     Plaintiff does not know the true names and capacities of the defendants sued as Does 1 through 50, inclusive, and thus Plaintiff sues these defendants by fictitious names. Plaintiff will amend his pleadings to allege their true names and capacities when ascertained. Upon information and belief, Does 1 through 50, inclusive, are responsible, at least in part, for the conduct alleged herein and such conduct damaged Plaintiff.

10.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334, because the case arises in or is related to Dewey & LeBoeuf's bankruptcy.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district and, alternatively, because Barclays is subject to personal jurisdiction in this judicial district.

### ALLEGATIONS APPLICABLE TO ALL CLAIMS FOR RELIEF

12.    Upon graduating from law school in 1990, Plaintiff worked as an attorney in the corporate and media department of the law firm of LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf Lamb"). In 1993, Plaintiff joined the law firm of Gold, Farrell & Marks (now part of Sonnenschein Nath & Rosenthal LLP) where he developed a well-known entertainment law practice in both litigation and transactional contact business. In 1996, Plaintiff founded his private boutique law practice, The McMillan Firm, which specialized in entertainment and media law.

13.    In 2007, LeBoeuf Lamb approached Plaintiff and asked him to re-join that law firm as the head of its new media, entertainment and sports division. Plaintiff entered negotiations with LeBoeuf Lamb regarding his law practice and his need to have members of his firm join him should he decide to fold his practice into LeBoeuf Lamb.

14.    In May 2007, Plaintiff signed LeBoeuf Lamb's offer letter and agreed to re-join the law firm as a partner and head of its new media, entertainment and sports division. Plaintiff accepted a position at LeBoeuf Lamb and agreed, in a written offer letter, to $1,500,000 in compensation for each of the next three (3) years, payable in monthly draws of $25,000 (less deductions for taxes and benefits) along with periodic distributions for the remaining amounts owed. Plaintiff brought several members of The McMillan Firm to LeBoeuf Lamb, including another corporate partner to join the firm.

15.    Immediately, Plaintiff established a profitable and high-profile entertainment law firm practice for LeBoeuf Lamb (and later Dewey & LeBoeuf), representing some of the most world renowned entertainment, media and sports clients.

16.    In or about May 2007, LeBoeuf Lamb's Chief Financial Officer, Joel Sanders, advised Plaintiff that: (a) upon becoming a partner at the firm, Plaintiff was required to make a capital contribution to the operating capital of LeBoeuf Lamb in the amount of $540,000.00, which was 36% of his annual compensation; (b) to fund his capital contribution, Plaintiff could utilize a capital loan program arranged by LeBoeuf Lamb with one if its lenders; and (c) there was no risk to Plaintiff to utilize the capital loan program because, upon his withdrawal from LeBoeuf Lamb, the law firm would repay any amounts due under the capital loan program. Plaintiff declined to utilize the capital loan program.

4

17.    In or about October 2007, LeBoeuf Lamb merged with another large and prominent law firm, Dewey Ballantine LLP to create Dewey & LeBoeuf. As a result of the merger, Dewey & LeBoeuf became one of the largest law firms in the world. This mega-merger caused immediate headline news and certain conflict within the new firm.

18.    In a Memorandum dated March 6, 2008, Joel Sanders and the rest of Dewey & LeBoeuf's Executive Committee advised Plaintiff, and other partners, of another capital loan program, arranged by Dewey & LeBoeuf, being offered by Barclays (the "Barclays Program") as an alternative method for Plaintiff to fund capital contributions (the "Memo").

19.    The Memo began: "In order to fund the Firm's working capital needs the Executive Committee has approved a capital loan program sponsored by Barclay's Bank."

20.    The Memo included the following note on the bottom of the page: "Based upon 2007 Participation Target of $1,500.000.00, your 2007 capital obligation is $540,000.00, of which $0 has already been paid, leaving you with an unpaid capital balance of $540,000.00."

21.    The Memo further stated and explained: "There will be no financial impact to you with respect to this loan, until such time as your capital is actually due to the firm."

22.    The Memo requested that Plaintiff sign an attached application form and return it to Mr. Sanders "no later than March 12, 2008 to facilitate this process[.]" Plaintiff declined to enroll in the Barclays Program.

23.    In 2008, Dewey & LeBoeuf paid Plaintiff $25,000 every month (less deductions for taxes and benefits) and distributed to Plaintiff an additional $390,000, but failed to pay him the remaining $810,000 of his annual compensation due and owing to him. Dewey & LeBoeuf also failed to pay other high-earning partners their agreed upon annual compensation. There was

no basis to deprive Plaintiff of his compensation since he was one of the partners who generated substantial revenue for Dewey & LeBoeuf.

24.     In 2009, Dewey & LeBoeuf only paid Plaintiff a total of $540,416.67, but failed to pay him the remaining $959,583.33 of his agreed-upon annual compensation. Again, Dewey & LeBoeuf also failed to pay other high-earning partners their agreed upon annual compensation.

25.     Notwithstanding the substantial sums owed to Plaintiff, which were never received by him, Dewey & LeBoeuf reported higher earnings to state and federal authorities than the compensation and income that Plaintiff received. The over-reportings were brought to the attention of Dewey & LeBoeuf's management.

26.     On March 4, 2010, Plaintiff met with Steve DiCarmine, Dewey & LeBoeuf's Chief Operating Officer, and Jeffrey Kessler, Dewey & LeBoeuf's Global Litigation Chair and a member of the law firm's Executive Committee, and advised them of his plans to wind-down and withdraw from the firm.

27.     Dewey & LeBoeuf accepted Plaintiff's withdrawal from the law firm, yet allowed Plaintiff to operate on the premises to wind down business and legal matters.

28.     In an email sent to Plaintiff on June 22, 2010, Joel Sanders outlined the amount of compensation that Dewey & LeBoeuf deemed was owed to Plaintiff. Messrs. DiCarmine and Canellas were copied on the email. At the bottom of the email, Mr. Sanders included the following chart (emphasis added):

| Year | Amount Owed |
| --- | --- |
| 2008 | 498,750.00 |
| 2009 | 70,791.66 |
| 2010 | 254,166.65 |
| Compensation Owed Partner: | 823,708.31 |
| | |
| **Capital Owed Firm** | **(540,000.00)** |
| Net Amount due Partner | 283,708.31 |

6

In the email, Mr. Sanders advised Plaintiff that the amount owed by Dewey & LeBoeuf to Plaintiff had been reduced by $540,000, the amount that Plaintiff had theretofore never contributed, as the law firm required. Specifically, Mr. Sanders expressly wrote to Plaintiff: "Your capital has already been deducted and processed as it was way overdue and you never processed the loan documents." Plaintiff was advised that he would receive all such sums including his capital contribution made to the firm, which was deducted from his compensation.

29.     As of June 30, 2010, the law firm owed Plaintiff over $1,700,000 in compensation, none of which has been paid.

30.     According to Barclays' allegations (made after Dewey & LeBoeuf filed for bankruptcy on May 28, 2012), Plaintiff and Barclays entered into a letter agreement dated June 24, 2010 (the "Letter Agreement") pursuant to which Barclays agreed to provide a loan of $540,000 (the "Loan") "to be used to assist [Plaintiff] with a partnership capital subscription to Dewey & LeBoeuf LLP (the 'Firm')."

31.     Section 3 of the purported Letter Agreement provides that the Loan "will be available for drawing in a single amount" and that "any amount drawn will be credited to an account" in the name of Dewey & LeBoeuf.

32.     Plaintiff has no recollection of signing any such Letter Agreement and, given that Dewey & LeBoeuf had previously advised Plaintiff in the aforementioned June 22, 2010 email that his capital contribution was being deducted from compensation owed to him, there was no reason for Plaintiff to sign the Letter Agreement and obtain the Loan to fund his capital contribution (which was no longer owed).

33.     Plaintiff never received any funds from Barclays.

34.    Barclays has not presented Plaintiff with any promissory note executed by Plaintiff in connection with the Loan or any communications between Barclays and Plaintiff, despite requests to receive such information from Barclays.

35.    The Letter Agreement is a fabrication. Plaintiff had no dealings with Barclays regarding a loan and Plaintiff did not need a loan.

36.    Even assuming that Plaintiff signed the Letter Agreement, he never authorized the Individual Defendants to deliver it to Barclays. Despite such lack of authorization, the Individual Defendants apparently delivered to Barclays a document purporting to contain Plaintiff's signature.

37.    Upon information and belief, Barclays had ceased making loans available to partners of Dewey & LeBoeuf either before or shortly after Plaintiff withdrew from the firm.

38.    On May 28, 2012, Dewey & LeBoeuf filed a petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (*In re Dewey & LeBoeuf LLP*, Case No. 12-12321 (MG)) (the "Dewey Bankruptcy").

39.    Barclays never communicated with Plaintiff in any manner whatsoever about the Loan until after Dewey & LeBoeuf filed for bankruptcy, which was well after Plaintiff withdrew from the law firm.

40.    According to a "Claim Form" and "Particulars of Claim" mailed by Barclay's counsel to Plaintiff, on or about December 7, 2012, Barclays filed a claim in the United Kingdom's High Court of Justice against Plaintiff alleging that the Loan was in default and seeking in excess of $550,000 in damages (the "UK Proceeding").

8

41.     Plaintiff has not been properly served with the Claim Form or the Particulars of Claim in the UK Proceeding and has filed an Acknowledgement of Service in the UK Proceeding disputing jurisdiction, and such objection to jurisdiction does not amount to a submission to the jurisdiction.

## FIRST CLAIM FOR RELIEF
### (Declaration that the Letter Agreement is Invalid and Unenforceable)

42.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 41 as if fully set forth herein.

43.     Plaintiff never had any dealings with Barclays and did not enter into the Letter Agreement with Barclays.

44.     There was no meeting of the minds between Plaintiff and Barclays with respect to the terms of the Letter Agreement.

45.     Plaintiff is entitled to a judgment declaring that the Letter Agreement is invalid and unenforceable.

## SECOND CLAIM FOR RELIEF
### (Rescission of Letter Agreement for Lack of Consideration)

46.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 45 as if fully set forth herein.

47.     Section 1 of the Letter Agreement states that its "Purpose" is for the Loan to be used to fund Plaintiff's capital contribution to Dewey & LeBoeuf."

48.     Plaintiff had no need to further fund his capital account.

49.     Prior to the date of the Letter Agreement, Dewey & LeBoeuf acknowledged to Plaintiff that his $540,000 capital contribution had been paid (by a deduction from the amounts owed by the law firm to Plaintiff).

50.     Furthermore, even assuming that Dewey & LeBoeuf had not so acknowledged, no capital contribution was due from Plaintiff to the law firm because the amount of compensation that the law firm owed Plaintiff greatly exceeded $540,000 and his capital account was fully funded prior to the date of the purported Letter Agreement.

51.     Thus, no capital contribution from Plaintiff to the law firm was actually due.

52.     The Loan proceeds were never delivered to Plaintiff.

53.     Plaintiff did not receive any consideration in exchange for allegedly being liable for repayment of the Loan.

54.     Barclays claims that the Letter Agreement is a binding and valid agreement.

55.     Plaintiff has no adequate remedy at law other than this form of action to have his rights determined as to the matters set forth herein.

56.     Plaintiff is entitled to a judgment rescinding the Letter Agreement for lack of consideration.

## THIRD CLAIM FOR RELIEF
### (Rescission of Letter Agreement for Mutual Mistake)

57.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 56 as if fully set forth herein.

58.     At the time that the Letter Agreement was allegedly entered into, both Plaintiff and Barclays were mistaken about the same material fact – that a capital contribution of $540,000 was due from Plaintiff to Dewey & LeBoeuf.

59.     In actuality, at the time that the Letter Agreement was allegedly entered into, no capital contribution was due from Plaintiff to Dewey & LeBoeuf.

60.     Plaintiff never received any funds directly from Barclays.

10

61.    Plaintiff has no adequate remedy at law other than this form of action to have his rights determined as to the matters set forth herein.

62.    Plaintiff is entitled to a judgment rescinding the Letter Agreement based upon mutual mistake.

## FOURTH CLAIM FOR RELIEF
### (Rescission of Letter Agreement for Fraud)

63.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

64.    According to section 10.1(j) of the Letter Agreement, an "Event of Default" includes "the event of any indebtedness of the Firm in excess of US$250,000 becoming immediately due and payable, or capable of being declared so due and payable, prior to its stated maturity, by reason of default on the part of any person...."

65.    According to the Letter Agreement, upon an Event of Default, Barclays may demand repayment of the outstanding Loan and all accrued interest.

66.    At the time that the parties allegedly entered into the Letter Agreement, Defendants knew that Dewey & LeBoeuf had already incurred indebtedness in excess of $250,000 that was immediately due and payable or was capable of being declared so due and payable (the "DL Indebtedness"). Stated differently, Defendants knew that an Event of Default existed the moment that the Letter Agreement was executed.

67.    Barclays knew of the DL Indebtedness because Barclays had a longstanding relationship with Dewey & LeBoeuf through, at a minimum, the Barclays Program for funding capital contributions.

11

68.     Barclays also knew of the DL Indebtedness because it ceased making loans to partners of Dewey & LeBoeuf based upon financial reasons, and Barclays failed to notify Plaintiff of the same.

69.     The Individual Defendants also knew of the DL Indebtedness because, as officers and directors of Dewey & LeBoeuf, they possessed all information relevant to the firm's financial affairs.

70.     Defendants failed to advise Plaintiff of the DL Indebtedness, despite their duties to advise Plaintiff of that material information.

71.     Barclays had a duty to disclose the DL Indebtedness to Plaintiff because Barclays made a partial disclosure, or "half-truth," in the Letter Agreement – namely that any indebtedness by Dewey & LeBoeuf in excess of $250,000 *would be* an Event of Default. The full truth, undisclosed to Plaintiff, was that Dewey & LeBoeuf *was already* indebted more than $250,000 and that such indebtedness was due and payable or capable of being declared immediately due and payable.

72.     All of the Defendants had a duty to disclose the DL Indebtedness to Plaintiff because they possessed superior knowledge of Dewey & LeBoeuf's financial condition, not readily available to Plaintiff (such information was only available to the law firm's senior management or Executive Committee members) and because, assuming that Plaintiff did enter into the Letter Agreement, Defendants knew that Plaintiff was acting on the basis of mistaken knowledge that an Event of Default was not already existing the moment the Letter Agreement was executed.

73.     Defendants intentionally failed to disclose the DL Indebtedness to Plaintiff to induce Plaintiff to enter into the Letter Agreement (assuming it is not a fabrication).

0740-002 Doc# 30 v.0

74.     By fraudulently inducing Plaintiff to enter into the Letter Agreement, upon the immediately present Event of Default, Barclays could pursue Plaintiff for hundreds of thousands of dollars while having no obligation to fund Plaintiff's capital contribution (which Plaintiff had already paid via a deduction of amounts of compensation owed to him).

75.     Even assuming that Plaintiff signed the Letter Agreement, Plaintiff believed that Defendants' representations were full and complete and that Defendants did not omit any material information.

76.     Even assuming that Plaintiff signed the Letter Agreement, Plaintiff signed the Letter Agreement in reasonable reliance upon: (a) Barclays' representations that an Event of Default did not already exist and (b) the Individual Defendants' failure to advise Plaintiff that an Event of Default already existed.

77.     Even assuming that Plaintiff signed the Letter Agreement, Plaintiff would not have signed the Letter Agreement if he had known the truth – that an Event of Default already existed by virtue of the DL Indebtedness.

78.     Given Defendants' fraudulent conduct, Plaintiff is entitled to a judgment declaring that the Letter Agreement is rescinded.

## FIFTH CLAIM FOR RELIEF
### (Declaration that the Loan is Not Due and Payable Until December 31, 2020)

79.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 78 as if fully set forth herein.

80.     Barclays claims that the Loan is due and payable by Plaintiff.

81.     Section 5(c) of the Letter Agreement states that, in the event of: (a) Plaintiff "ceasing to practice as a partner with the Firm" and (b) "the provisions of Article X of the Firm's Partnership Agreement preventing immediate repayment of [Plaintiff's] partnership capital, the

13

Loan shall become due and payable at the times and in such amounts as [Plaintiff's] capital account is repaid in accordance with the Firm's Partnership Agreement ... and in any event no later than the date falling 120 months after the date upon which [Plaintiff] ceases to practice as a partner with the Firm."

82.     Dewey & LeBoeuf has not repaid Plaintiff's capital account in accordance with the Firm's Partnership Agreement.

83.     Thus, even assuming that the Letter Agreement is deemed valid, the Loan is due and payable on December 31, 2020, said date being 120 months after December 31, 2010, the date upon which Plaintiff ceased to practice as a partner of the law firm.

84.     Plaintiff has no adequate remedy at law other than this form of action to have his rights determined as to the matters set forth herein.

85.     In the alternative to rescinding the Letter Agreement, the Court should enter judgment declaring that the Loan is not due and payable until December 31, 2020.

**SIXTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty Against the Individual Defendants)**

86.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 85 as if fully set forth herein.

87.     The Individual Defendants were Plaintiff's fiduciaries and owed him the highest duty of care and loyalty.

88.     By delivering Plaintiff's purported signature on the Letter Agreement to Barclays without Plaintiff's consent, and by intentionally or negligently concealing the DL Indebtedness from Plaintiff, the Individual Defendants breached their fiduciary duties.

89.     As a proximate result of the Individual Defendants' breach of fiduciary duties, Plaintiff has suffered damages in an amount to be determined at trial, plus interest.

14

## SEVENTH CLAIM FOR RELIEF
### (Fraud Against the Individual Defendants)

90.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 89 as if fully set forth herein.

91.     At the time that the Individual Defendants delivered to Barclays, without Plaintiff's consent, Plaintiff's purported signature of the Letter Agreement, the Individual Defendants knew of the DL Indebtedness.

92.     The Individual Defendants failed to advise Plaintiff of the DL Indebtedness.

93.     The Individual Defendants intentionally failed to disclose the DL Indebtedness to Plaintiff to induce Plaintiff to enter into the Letter Agreement.

94.     Plaintiff believed that the Individual Defendants' representations were full and complete and that the Individual Defendants did not omit any material information.

95.     Because of the fiduciary relationship between Plaintiff and the Individual Defendants, Plaintiff reasonably relied upon the Individual Defendants to fully disclose all material information to him.

96.     Even assuming that Plaintiff signed the Letter Agreement, Plaintiff would not have signed the Letter Agreement if he had known the truth – that an Event of Default already existed by virtue of the DL Indebtedness.

97.     As a proximate result of the Individual Defendants' fraudulent conduct, Plaintiff has suffered damages in an amount to be determined at trial, plus interest.

## EIGHTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

98.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 97 as if fully set forth herein.

15

99.    The Individual Defendants and Plaintiff were in a special or privity-like relationship, described above, imposing a duty upon the Individual Defendants to impart correct information to Plaintiff.

100.    To the extent that the Individual Defendants' did not conceal the DL Indebtedness intentionally, they negligently advised to Plaintiff to enter into a loan agreement that, unbeknownst to Plaintiff and known to the Individual Defendants, was already in default.

101.    Given the Individual Defendants' superior knowledge of Dewey & LeBoeuf's finances and given the Individual Defendants' fiduciary duties to Plaintiff, Plaintiff reasonably relied upon advice given by them and trusted that they would not withhold any material information from him.

102.    As a proximate result of the Individual Defendants' negligent representations or omissions of material facts, Plaintiff has suffered damages in an amount to be determined at trial, plus interest.

Wherefore, Plaintiff respectfully requests that the Court enter judgment:

(a)    on the First Claim for Relief, declaring that the Letter Agreement is invalid and unenforceable;

(b)    on the Second Claim for Relief, rescinding the Letter Agreement for lack of consideration;

(c)    on the Third Claim for Relief, rescinding the Letter Agreement based upon mutual mistake;

(d)    on the Fourth Claim for Relief, declaring that the Letter Agreement is rescinded based upon fraud;

16

(e)     on the Fifth Claim for Relief, declaring that the Loan is not due and payable until December 31, 2020;

(f)     on the Sixth Claim for Relief, awarding Plaintiff damages in an amount to be determined at trial, plus interest;

(g)     on the Seventh Claim for Relief, awarding Plaintiff damages in an amount to be determined at trial, plus interest;

(h)     on the Eighth Claim for Relief, awarding Plaintiff damages in an amount to be determined at trial, plus interest;

(i)     awarding Plaintiff the costs and disbursements of the action, including attorneys' fees; and

(j)     granting Plaintiff such other and further relief as the Court deems appropriate.

17

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:    New York, New York       MEISTER SEELIG & FEIN LLP
          April 3, 2013

                                /s/ Kevin Fritz
                                Jeffrey Schreiber (js@msf-law.com)
                                Kevin Fritz (kaf@msf-law.com)
                                Two Grand Central Tower, 19th Floor
                                140 East 45th Street
                                New York, NY
                                Telephone: (212) 655-3500
                                Facsimile: (212) 655-3535
                                Attorneys for Plaintiff

0740-002 Doc# 30 v.0